UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ALDWIN BRATHWAITE,

        Petitioner,

v.                                                    20-CV-174 (JLS)

WILLIAM BARR, in his official
capacity as Attorney General, U.S.
Department of Justice, et al.,

        Respondents.[1]

---

## DECISION AND ORDER

Aldwin Brathwaite is a native and citizen of Trinidad and Tobago.  He has been detained since January 2019 at the Buffalo Federal Detention Facility in Batavia, New York pending removal proceedings.  His order of removal became administratively final in December 2019, and his petition for review ("PFR") is pending at the Second Circuit.  He now petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241.  Brathwaite argues that the mandatory detention statutes of the Immigration and Nationality Act are unconstitutional as applied to him.  He asks the Court to order Respondents (hereinafter "the

---

[1] The Government argues, and this Court agrees, that the only proper Respondent in this case is Jeffrey Searls, the Assistant Officer in Charge of the Buffalo Federal Detention Facility, because he is the only Respondent with immediate custody over Brathwaite.  Dkt. 9, at 1 n.1; *see, e.g., Rodriguez v. Barr*, No. 6:18-cv-06757-MAT, 2019 WL 2192516, at *3 n.3 (W.D.N.Y. May 21, 2019) (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("Searls is the only proper respondent in this [Section] 2241 proceeding as he is the person with direct control over Petitioner's detention.").

Government") to hold a constitutionally adequate bond hearing at which he may contest his continued detention and at which the Department of Homeland Security ("DHS") must establish, by clear and convincing evidence, that his continued detention is justified.

For the reasons that follow, this Court concludes that Brathwaite is detained under 8 U.S.C. § 1231—not Section 1226(c). And because the forbearance policy does not qualify as a court-ordered stay under Section 1231(a)(1)(B)(ii), it does not interrupt or toll the removal period. Finally, under *Zadvydas v. Davis*, 533 U.S. 678 (2001), the relief requested in Brathwaite' petition for writ of habeas corpus is denied because he fails to show there is no significant likelihood of his removal in the reasonably foreseeable future.

## BACKGROUND

### I.   TIMELINE OF RELEVANT EVENTS

Brathwaite entered the United States in 1979 as a lawful permanent resident from Trinidad and Tobago.  Dkt. 1, at 6 ¶ 26.[2]

On January 31, 2018, Brathwaite was convicted of the following offenses in the New York County Supreme Court: (1) New York Penal Law § 190.80(3), Identity Theft in the first degree; (2) New York Penal Law § 110-155.40(1), Attempted Grand Larceny in the second degree; (3) New York Penal Law § 165.45(2), Possession of

---

[2] Page references and citations to the parties' written submissions—including the petition, answer, declarations, and other briefing—are to the page numbers reflected on the documents themselves.  However, citations to the parties' attached exhibits (specifically in Dkt. 1-1 and Dkt. 8) will use the pagination automatically generated by CM/ECF.

Stolen Property in the fourth degree; (4) New York Penal Law § 110-190.80(1),

Attempted Identity Theft in the first degree; (5) New York Penal Law § 155.30(1),

Grand Larceny in the fourth degree; and (6) New York Penal Law § 190.79(3),

Identity Theft in the second degree. *See* Dkt. 1, at 6 ¶ 27; Dkt. 1-1, at 4 (Exh. A).

As a result, Brathwaite was sentenced to a minimum of two years and maximum of

four years in prison. *See* Dkt. 1, at 6 ¶ 27; Dkt 1-1, at 8 (Exh. B).

On October 11, 2018, while Brathwaite was incarcerated, DHS determined

that Brathwaite was removable because of his convictions and issued a Notice to

Appear ("NTA") as well as a Warrant for Arrest of Alien.  Dkt. 1-1, at 2 (Exh. A);

Dkt. 8, at 36 (Exh. A).  DHS served Brathwaite with the NTA on November 7, 2018.

Dkt. 8, Smith Decl. at 4 ¶ 21.  The NTA charged Brathwaite with removability,

under 8 U.S.C. § 1227(a)(2)(A)(ii)-(iii), based on his convictions of the following: (1)

an aggravated felony relating to a theft offense, as defined by INA §§

237(a)(2)(A)(iii) and 101(a)(43)(G); (2) an aggravated felony relating to an attempt

or conspiracy to commit another aggravated felony, as defined by INA §§

237(a)(2)(A)(iii) and 101(a)(43)(U); (3) an aggravated felony relating to a fraud or

deceit offense in which the loss to the victim or victims exceeds $10,000, as defined

by INA §§ 237(a)(2)(A)(iii) and 101(a)(43)(M); and (4) two crimes involving moral

turpitude, as outlined by INA § 237(a)(2)(A)(ii).  Dkt. 1-1, at 4-5 (Exh. A).

On January 18, 2019, Brathwaite received a Notice of Custody

Determination, which informed him that he would be detained by DHS pending a

final administrative determination in his case.  Dkt. 9, at 3.

3

On May 23, 2019, Brathwaite filed a motion with the New York State Supreme Court, Appellate Division, First Department, requesting leave to file a late notice of appeal of his underlying criminal convictions, and the First Department granted the motion.  Dkt. 1, at 7 ¶ 32; Dkt. 8, Smith Decl. at 5 ¶ 26.

Brathwaite also filed a motion in Batavia Immigration Court to terminate his removal proceedings based on a pending criminal appeal.  Dkt. 8, at 49-55 (Exh. A). The immigration judge denied the motion on June 7, 2019, and ordered Brathwaite removed to Trinidad and Tobago on June 11, 2019.  *See* Dkt. 1-1, at 18-19 (Exh. E); Dkt. 8, at 47, 73 (Exh. A).  Brathwaite appealed this order to the Board of Immigration Appeals ("BIA"), which affirmed the immigration judge's decision on December 11, 2019.  Dkt. 1, at 7-8 ¶ 33; Dkt. 1-1, at 22-25 (Exh. F).

On December 17, 2019, Deportation Officer Brandon Smith served Brathwaite with a Warning for Failure to Depart.  Dkt. 8, Smith Decl. at 6 ¶ 34; Dkt. 8, at 82-84 (Exh. A).  Brathwaite signed and acknowledged receipt of this document, which warned him of the consequences of his failure to comply with the administrative removal order.  Dkt. 8, at 4 ¶ 9; Dkt. 8, at 82-84 (Exh. A). Brathwaite also received a document listing the required steps he had to take to assist in obtaining travel documents.  Dkt. 8, at 4-5 ¶ 9; Dkt. 8, at 83-84 (Exh. A). Brathwaite filed an application form for Trinidad and Tobago Emergency Travel Document, as well as a visa application form for Trinidad and Tobago.  Dkt. 8, at 5 ¶ 10; Dkt. 8, at 88-94 (Exh. A).

On December 18, 2019, ICE issued a Warrant of Removal/Deportation.  Dkt. 8, at 5 ¶ 11; Dkt. 8, at 22 (Exh. A).  The next day, ICE requested the issuance of a travel document from the Consulate of Trinidad and Tobago in order to facilitate Brathwaite's return.  Dkt. 8, at 5 ¶ 12; Dkt. 8, at 85-86 (Exh. A).

On January 6, 2020, Brathwaite filed a petition for review ("PFR") of the BIA's December 11, 2019 decision with the United States Court of Appeals for the Second Circuit. *See Brathwaite v. Barr*, No. 20-27 (2d Cir. filed Jan. 6, 2020), Dkt. 1; *see also* Dkt. 1-1, at 27-29 (Exh. G).  And on February 2, 2020, he filed a motion to stay his removal. *See* Dkt. 1-1, at 32-58 (Exh. H).  Both of these items remain pending at the Second Circuit.  The parties acknowledge that, due to an agreement between DHS and the Second Circuit (the "forbearance policy"), DHS will not enforce Brathwaite's removal order until the Second Circuit rules on his motion for a stay or otherwise disposes of his PFR.  Dkt. 1, at 8 ¶ 34; Dkt 9, at 4.

## II.   PROCEDURAL HISTORY

On February 8, 2020, Brathwaite filed this Petition for a Writ of Habeas Corpus challenging his detention at the Buffalo Federal Detention Facility.  Dkt. 1.  The Government answered and filed a memorandum and declarations in opposition, on April 9, 2020.  Dkts. 8, 9.  Brathwaite replied on April 28, 2020.  Dkt. 11.

On July 7, 2020, this Court ordered supplemental briefing to address Brathwaite's argument that the COVID-19 pandemic and travel restrictions have curtailed efforts to remove him in the reasonably foreseeable future.  Dkt. 12.  The Government responded on July 16, 2020.  Dkt. 13.  Brathwaite declined to file an

additional substantive reply, indicating he would rely on his previous arguments. Dkt. 14.

## DISCUSSION

### I.   JURISDICTION

Habeas corpus review is available to persons who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Circuit courts have jurisdiction, to the exclusion of district courts, over challenges to the legality of final orders of deportation, exclusion, and removal. *See Gittens v. Menifee*, 428 F.3d 382, 384 (2d Cir. 2005) ("[The REAL ID Act, 119 Stat. 231, § 106(a) (May 11, 2005)] eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review . . . which circuit courts alone can consider."). District courts, however, can review claims by aliens challenging the constitutionality of their pre-removal detention. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003).

In this case, Brathwaite asserts that his "unreasonably prolonged" detention, without any adversarial hearing at which he could challenge his custody, violates the Fifth Amendment's due process clause. Dkt. 1, at 1 ¶¶ 3-6; Dkt. 1, at 17 ¶¶ 60-66. Therefore, Brathwaite asks this Court to order the Government to provide "a constitutionally adequate, individualized hearing before an impartial adjudicator at which Respondents bear the burden of establishing by clear and convincing evidence" that he is a "danger to the community or such a flight risk that no

6

alternatives to detention could reasonably secure his future compliance with the orders of immigration officials." Dkt. 1, at 16-17.

## II.  STATUTORY BASIS FOR PETITIONER'S DETENTION

At the outset, this Court must determine the statutory basis for Brathwaite's detention. Whether his detention is governed by 8 U.S.C. § 1226 or 8 U.S.C. § 1231 potentially impacts whether he is entitled to relief and, if so, the form of that relief. *See Narain v. Searls*, No. 19-CV-6361 (CJS), 2020 WL 95425, at *2 (W.D.N.Y. Jan. 8, 2020) (citing *Enoh v. Sessions*, 236 F. Supp. 3d 787, 791 (W.D.N.Y. 2017)).

### A. Section 1226 versus Section 1231

8 U.S.C. § 1226 governs the detention of aliens *before* the removal period— broadly speaking, the detention of those aliens who "are not immediately deportable." *Hechavarria v. Sessions*, 891 F.3d 49, 57 (2d Cir. 2018). Section 1226(c) specifically governs the arrest and detention of aliens who have committed certain criminal offenses enumerated in 8 U.S.C. § 1227. 8 U.S.C. § 1226(c). This section provides, in relevant part, that the "Attorney General shall take into custody any alien who . . . is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title." *Id.* § 1226(c)(1)(B). Thus, detention of certain criminal aliens pending removal proceedings is mandatory.

8 U.S.C. § 1231 governs the detention of aliens *during and after* the removal period—namely, those who are subject to final orders of removal. This period is derived from the statute, which allows DHS 90 days to effectuate a removal from

the United States following the entry of a final order of deportation or removal. *Id.*
§ 1231(a)(1)(A).

In particular, Section 1231(a)(1)(B) states that the removal period begins at
the latest of the following events:

(i)     The date the order of removal becomes administratively final.
(ii)    If the removal order is judicially reviewed and if a court orders a stay
        of the removal of the alien, the date of the court's final order.
(iii)   If the alien is detained or confined (except under an immigration
        process), the date the alien is released from detention or confinement.

*Id.* § 1231(a)(1)(B).

During the 90-day removal period, detention is mandatory. *Id.* § 1231(a)(2).
Once this removal period is over, detention is discretionary: an alien may be
detained beyond the removal period if, among other things, he or she is removable
under certain provisions of 8 U.S.C. § 1227. *See id.* § 1231(a)(6).

Brathwaite argues that the statutory basis for his detention is 8 U.S.C. §
1226(c). Dkt. 1, at 4 ¶¶ 20-21. Brathwaite does not dispute his detention would be
mandated under Section 1226(c). Dkt. 1, at 1 ¶ 3. He argues instead that, once a
detention has become unreasonably prolonged, a noncitizen—including one
statutorily subjected to mandatory detention— is constitutionally entitled to a bond
hearing at which the government must justify further detention. Dkt. 1, at 10 ¶ 42.
Brathwaite maintains he is not detained under Section 1231 because his removal is
effectively stayed by the Second Circuit's forbearance policy and, thus, the removal
period under Section 1231 has not begun under Section 1231(a)(1)(B)(ii). Dkt. 11, at
1-5.

The Government disagrees and argues that Brathwaite is detained under 8 U.S.C. § 1231. Dkt. 9, at 9. The Government argues that Brathwaite is subject to an administratively final order of removal, no stay of removal has been issued, and the forbearance policy is not a formal judicial order of a stay of removal. Dkt. 9, at 10-11. According to the Government, Brathwaite is lawfully detained beyond the 90-day period under Section 1231(a)(6) as an alien removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii) and (iii). Dkt. 9, at 10.[3]

Here, the crux of the parties' disagreement is whether Section 1226 or Section 1231 authorizes the detention of aliens, such as Brathwaite, whose ordered-removal is prevented by the forbearance policy between the Second Circuit and the Government rather than by a judicially-ordered stay of removal. As explained below, because Brathwaite's order of removal is "administratively final," and because the forbearance "policy" is not a "stay of removal," Brathwaite's detention is governed by Section 1231.

In particular, Brathwaite's order of removal has become administratively final pursuant to 8 U.S.C. § 1231(a)(1)(B)(i). Under 8 C.F.R. § 1241.1(a), an order of removal made by an immigration judge "shall become final . . . [u]pon dismissal of an appeal by the Board of Immigration Appeals." Brathwaite's order of removal became administratively final when the BIA dismissed his appeal—affirming the

---

[3] As discussed further below, the Government alternatively argues that Brathwaite remains detained under Section 1231(a)(2) because the forbearance policy tolled his removal period. Dkt. 9, at 12-13.

immigration judge's order of removal—on December 11, 2019. *See* Dkt. 1-1, at 22-25 (Exh. F).

The question remains whether Brathwaite's PFR and pending stay motion to the Second Circuit operate to postpone the removal period such that Brathwaite's detention is actually under Section 1226(c), not Section 1231. They do not.

To be sure, the Second Circuit in *Hechevarria* held that the "unambiguous language" of 8 U.S.C. § 1231(a)(1)(B)(ii) clearly states that an alien subject to an administratively final order of removal cannot be detained under Section 1231 when he or she has filed a petition for review with the court of appeals *and received a stay from that court.* 891 F. 3d at 55-56. In such circumstances, the "removal period" under Section 1231 would not begin until the Second Circuit issued its final order. *Id.*

Here, Brathwaite's administratively final removal order is under judicial review, and he has moved the Second Circuit for a stay of removal. *See* Motion for Stay of Removal, *Brathwaite v. Barr*, No. 20-27 (2d Cir Feb. 2, 2020), Dkt. 11; *see also* Dkt. 1-1, at 32-58 (Exh. H). But, to date, the Second Circuit has not ordered a stay of removal in Brathwaite's case, as it did in *Hechavarria*. Thus, of the three scenarios that can trigger the start of the removal period, only the first—an administratively final order of removal—has occurred. 8 U.S.C. § 1231(a)(1)(B)(i)-(iii). Neither of the other two triggering events has occurred: no court has ordered a stay of Brathwaite's removal, nor has Brathwaite been released from detention or

confinement.  *See Narain*, 2020 WL 95425, at *3 (citing 8 U.S.C. § 1231(a)(1)(B)(ii)-(iii)).

As a result, Brathwaite urges this Court to deem the forbearance policy between the Second Circuit and DHS—triggered by the filing of a PFR with a motion for stay of removal—to be *the equivalent of* a court-ordered stay of removal under Section 1231(a)(1)(B)(ii).  Brathwaite's argument fails and, thus, his detention is governed by Section 1231.

### B. The Meaning of "Stay" in Section 1231(a)(1)(B)(ii) Does Not Encompass the DHS-Second Circuit Forbearance Agreement

Whether Section 1226 or Section 1231 applies here turns on the meaning of the word "stay" in Section 1231(a)(1)(B)(ii).  As discussed below, the forbearance is not a stay.

A stay is "[t]he postponement or halting of a proceeding, judgment, or the like" or "[a]n order to suspend all or part of a judicial proceeding or a judgment resulting from that proceeding."  *Stay*, Black's Law Dictionary (11 ed. 2019).  A party seeking a stay of a judgment or order pending appeal must make a motion for such relief, ordinarily in the district court first.  *See* Fed. R. App. P. 8(a).  A stay is an "intrusion into the ordinary processes of administration and judicial review" and, accordingly, "is not a matter of right, even if irreparable injury might otherwise result to the appellant."  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (first quoting *Virginia Petroleum Jobbers Assn. v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958); then quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)).

11

Beyond having the practical effect of preventing some action, a stay "operates upon the judicial proceeding itself" by "temporarily suspending the source of authority to act." *Nken*, 556 U.S. at 428-29.  In the context of an alien awaiting adjudication of a PFR, a stay is "a temporary setting aside of the Government's authority to remove," and a return to the status quo—namely, before the removal order was entered. *Id.* at 429.

In contrast, the forbearance "understanding" at issue here—whereby aliens filing PFRs and stay motions will not be removed until the Second Circuit rules— represents a "voluntary decision" on the part of the Executive Branch, and is subject to change. *See* Letter from the Hon. Jon O. Newman, United States Circuit Judge, United States Court of Appeals for the Second Circuit, to David M. McConnell, Director, Office of Immigration Litigation (Mar. 16, 2009).  Indeed, the understanding between the Second Circuit and the Executive Branch acknowledges that it is something different from a stay, which stay nevertheless can be obtained as the Second Circuit deems appropriate. *See generally* Letter from David M. McConnell, Deputy Director, Office of Immigration Litigation, to the Hon. Jon O. Newman, United States Circuit Judge, United States Court of Appeals for the Second Circuit (Apr. 8, 2009).  And the Government has specifically noted that there are "circumstances that arise that fall outside the scope of the forbearance arrangement." *Id.* at 2.  The arrangement represents the Executive Branch's current approach in this area, and the Executive Branch is free to review its current practices and notify the Second Circuit upon "determin[ing] a different approach is

warranted." Letter from Thomas W. Hussey, Director, Office of Immigration Litigation, to the Hon. Dennis Jacobs, Chief Judge, United States Court of Appeals for the Second Circuit (Jan. 26, 2007).

In sum, this policy, or agreement, or understanding is not and does not purport to be a stay. Rather, it is, by its terms, *in contrast to* a "stay." Whatever it is, it is not a "stay" as that term is used in Section 1231.

Courts looking to understand a law must "accept and apply the presumption that lawmakers use words in 'their natural and ordinary signification.'" *King v. Burwell*, 135 S. Ct. 2480, 2497 (2015) (Scalia, J., dissenting) (quoting *Pensacola Telegraph Co. v. Western Union Telegraph Co.*, 96 U.S. 1, 12 (1878)). Usually the contextual evidence must be compelling to overcome the "ordinary connotation" and more natural interpretation of a law. *Id.* Reading the phrase, "if a court orders a stay of the removal of the alien," in Section 1231(a)(1)(B)(ii) to include the effect of an informal, Executive Branch policy not to remove aliens in certain situations is unnatural. The ordinary meaning of this statutory, court-ordered stay provision requires that a court actually order a stay of removal.[4]

---

[4] The statutory context of Section 1231 reinforces its ordinary meaning. As the Supreme Court discussed in *Nken*, Congress repealed the presumption of an automatic stay pending judicial review of an alien's petition when it passed the Immigration Reform and Immigrant Responsibility Act of 1996. 556 U.S. at 424-425. With this change, Congress "intentionally eliminated the presumption of an automatic stay for aliens seeking judicial review of their order of removal, and replaced that presumption with the requirement that the court of appeals expressly order a stay." *Narain*, 2020 WL 95425, at *4 (citing 8 U.S.C. § 1252(b)(3)(B) ("Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.")). In this context, as the court in *Narain* noted, the DHS-Second Circuit

Brathwaite would have this Court read "stay" to mean something that is not a stay because such a reading supposedly yields more sensible outcomes. This reasoning is flawed.

Even if it were true that Brathwaite's interpretation leads to more sensible outcomes, the ordinary meaning of the term results in a supposed "oddity" only in the context of the Second Circuit's forbearance arrangement—it is not a statutory "ambiguity." *See King*, 135 S. Ct. at 2500. Courts do not "revise legislation . . . just because the text as written creates an apparent anomaly as to some subject it does not address." *Mich. v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014).

Nor should a court correct even a drafting error that leads to an absurd result unless it is "patently obviously to a reasonable reader that a drafting mistake has occurred." *King*, 135 S. Ct. at 2504-05. The standard for absurd results in this context—"a consequence so monstrous, that all mankind would, without hesitation, unite in rejecting the application"—is not met here. *Id.* at 2505 (internal quotation and citation omitted). The Court's reading of this stay provision is, at the very least, a plausible interpretation. The alleged absurd result Brathwaite suggests is not enough to overcome the ordinary meaning of Section 1231(a)(1)(B)(ii). This case presents no occasion for error-correction to prevent absurd results. The Court

---

forbearance policy "does not rise to the level of a court-ordered stay." *Id.* at *4; *see also Jean A. v. Dep't of Homeland Sec.*, No. 19-13951 (SDW), 2019 WL 6318305, at *2 (D.N.J. Nov. 26, 2019) ("That the forbearance agreement has the effect of preventing removal during the pendency of a petition for review is immaterial—as it is not a court order entering a stay, it cannot revert an alien's detention to pre-final order status.").

possesses only the power to "pronounce the law as Congress has enacted it," and lacks the "prerogative to repair laws that do not work out in practice." *Id.*

It may be true that, in practice, two detained petitioners in nearly identical procedural positions could be treated differently due to the forbearance policy in the Second Circuit. *See Falodun v. Sessions*, No. 6:18-cv-06133-MAT, 2019 WL 6522855, at \*6 (W.D.N.Y. Dec. 4, 2019) (hypothetically comparing two aliens who moved for a stay of removal, but were detained under different statutes based on the government's litigation decisions and the forbearance policy). But the fact that a statute leads to different results does not make the statute "absurd." *See Gibbons v. Bristol-Meyers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) ("[A] statute is not 'absurd' merely because it produces results that a court or litigant finds anomalous or perhaps unwise."). Rather, under the canon against absurdity, courts ought to look beyond the statutory text "only where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone." *Id.* at 705-06 (internal quotations omitted) (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 517 (2d Cir. 2017)).

Moreover, statutory purpose and design are relevant only to the extent they help clarify an otherwise ambiguous provision. But "even the most formidable argument concerning the statute's purposes" cannot "overcome the clarity [of] the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012). The result here—that

15

Brathwaite is detained under Section 1231, not 1226(c)—is clearly authorized by the text of Section 1231(a)(1)(B)(ii), and is "neither absurd nor fundamentally unfair." *Gibbons*, 919 F.3d at 707 (concluding that it is not "absurd" under 28 U.S.C. § 1441(b)(2) that a home-state defendant may in limited circumstances remove actions filed in state court on the basis of diversity of citizenship).

In sum, the question is not what Congress would have or may have wanted, but what it enacted. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). A court-ordered stay is a court-ordered stay. And no stay has been granted here. The forbearance policy coupled with a pending motion for a stay do not equal such a stay. Close enough is not good enough. Section 1231 applies.[5]

---

[5] District courts in this Circuit, both before and after *Hechavarria*, have been divided on this question. Many have determined that, given the reasoning of *Hechavarria*, the forbearance policy must be equivalent to a court-ordered stay and evaluated the detention of aliens with pending PFRs and pending stay motions with the Second Circuit under Section 1226. *See, e.g.*, *Sankara v. Whitaker*, No. 18-CV-1066, 2019 WL 266462, at *4-5 (W.D.N.Y. Jan. 18, 2019) (collecting cases); *Ranchinskiy v. Barr*, 422 F. Supp. 3d 789, 796 (W.D.N.Y. 2019) ("[T]he overwhelming majority of courts in this Circuit have found that the forbearance agreement amounts to a 'court-order[ed] stay of the removal of the alien' and that detainees with a pending petition for review are detained pursuant to § 1226."). Other courts have concluded the opposite—that the detention of an alien subject to a final order of removal is governed by Section 1231, notwithstanding the forbearance agreement. *See Narain*, 2020 WL 95425, at *4-5; *Mathews v. Philips*, No. 13-cv-339-JTC, 2013 WL 5288166, at *3 (W.D.N.Y. Sept. 18, 2013); *Leslie v. Herron*, No. 10-CV-00515(A)(M), 2010 WL 4226561, at *2 (W.D.N.Y. Oct. 26, 2010). And courts outside the Second Circuit examining this same forbearance policy have agreed that Section 1231 applies. *See Rone v. Aviles*, Civ. No. 15-3798 (KM), 2016 WL 158521, at *5 (D.N.J. Jan. 13, 2016) ("Several district courts within the Third Circuit have found that the Second Circuit's forbearance policy does not convert a petitioner's immigration detention status from Section 1231 to Section 1226.") (collecting cases). *Hechavarria*, which did not address the situation presented by these cases, does not mandate a different result. *See* 891 F.3d at 54 n.3 ("Because we review [petitioner's] habeas petition after this Court has issued a stay of removal

For these reasons, Brathwaite is an alien subject to a final order of removal pursuant to 8 U.S.C. § 1231.  Therefore, this Court will review the merits of his claims under the Section 1231 criteria set forth by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678 (2001).

## III.   BRATHWAITE'S DUE PROCESS CLAIMS

Brathwaite argues that his continued detention violates his due process rights under the Fifth Amendment.  Dkt. 1, at 16 ¶¶ 60-65.  He argues that, even if he is detained under Section 1231, his detention has become unreasonably long, and procedural due process requires that DHS provide him with a hearing at which DHS must justify his continued detention.  Dkt. 1, at 1 ¶ 6; Dkt. 1, at 16 ¶¶ 62-65.

The Government argues that Brathwaite's filing of the PFR and a motion for a stay, together with the forbearance policy, tolls the removal period.  Dkt. 9, at 11. Alternatively, the Government argues that Brathwaite has failed to show, under *Zadvydas*, that there is no significant likelihood of his removal in the reasonably foreseeable future.  Dkt. 9, at 15-16.

In *Zadvydas*, the Supreme Court considered how 8 U.S.C. § 1231, and its "apparent authorization of indefinite executive detention," interacts with the Fifth Amendment's prohibition against depriving a person of their liberty without due process. *See Wang v. Ashcroft*, 320 F.3d 130, 146 (2d Cir. 2003).  The Supreme Court determined that Section 1231(a) authorizes detention after a final order of

---

in his underlying petition for review, we need not decide the contours of judicial review during detention pursuant to the government's forbearance policy in this Circuit.").

removal for a period "reasonably necessary" to effectuate the alien's removal from the United States. *See Zadvydas*, 533 U.S. at 699-700. In other words, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by the statute. *See id.* The Court ruled that a six-month period of detention pending removal is presumptively reasonable. *Id.* at 701. After six months, a detained noncitizen may seek release by demonstrating that his or her removal is not likely to occur in the reasonably foreseeable future. *Id.* at 699-700.

## A. Whether the Removal Period is Tolled by the Forbearance Policy

As discussed above, Brathwaite's mandatory 90-day removal period began on December 11, 2019—the day the BIA dismissed his appeal of the immigration judge's removal order and that removal order became administratively final. Dkt. 1-1, at 22-25 (Exh. F); 8 U.S.C. § 1231(a)(1)(B)(i). Beginning on that date, Brathwaite's detention became mandatory under Section 1231(a)(2). 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien."). Brathwaite filed his petition for review in the Second Circuit on January 4, 2020, and filed a motion for a stay of removal on February 2, 2020. Dkt. 1-1, at 27-58 (Exhs. G, H); *see* Petition, Motion for Stay of Removal, *Brathwaite v. Barr*, No. 20-27 (2d Cir Feb. 2, 2020), Dkts. 1, 11. Both parties agree that, because he filed a PFR and a motion for a stay of removal, Brathwaite is protected by the forbearance policy, which ensures DHS will not enforce his removal order before the Second Circuit rules on the motion for a stay or dismisses the PFR. Dkt. 1, at 8 ¶ 34; Dkt. 9, at 4.

18

Also as discussed above, the forbearance policy does not qualify as a court-ordered stay. But the question remains whether the forbearance policy nevertheless affects the calculation of the mandatory removal period. The Government argues that the Second Circuit's forbearance policy tolls the running of the removal period, such that Brathwaite's removal period was "effectively stayed" when he sought judicial review of his removal order. Dkt. 9, at 12-13. To support this argument, the Government relies primarily on a case from this district, *Beckford v. Lynch*, 168 F. Supp. 3d 533 (W.D.N.Y. 2016). In *Beckford*, the court noted that numerous courts in this circuit have held that the filing of a PFR of a final order of removal, accompanied by a motion for a stay of removal, triggers the aforementioned forbearance policy that prevents an alien's removal while his or her PFR is pending. 168 F. Supp. 3d at 538. Pursuant to this policy, the court concluded that the removal period was "effectively stayed" from the date of filing the PFR with the Second Circuit to the date the Second Circuit dismissed the PFR. *Id.* Applied to Brathwaite, the Government calculates that only twenty-six days of Brathwaite's removal period have passed: the period began on December 11, 2019 but was "effectively stayed" as of January 6, 2020, when Brathwaite filed the PFR.[6] Dkt. 9, at 12.

_____

[6] The Court notes that if it were to adopt *Beckford*'s and the Government's reasoning here, this calculation is likely incorrect. The basis of this argument is that the forbearance policy "pauses" or tolls the running of the removal period. But as *Beckford* and other cases have stated, the forbearance policy is not triggered by a filing of a PFR alone: rather, it is the filing of a PFR and a motion for a stay of removal that triggers the forbearance policy. *Beckford*, 168 F. Supp. 3d at 538; *see also Yusuf v. Edwards*, No. 18-CV-3605 (GBD) (BCM), 2019 WL 4198798, at *5 n.4

The Court is not persuaded—by *Beckford* or the Government's argument—
that tolling is appropriate here.  First, the Court acknowledges that courts in this
circuit and others disagree about whether the forbearance policy tolls the removal
period.  *Compare Barua v. Aviles*, No. 15-3768 (ES), 2016 WL 4161099, at *3 (D.N.J.
Aug. 4, 2016) (petitioner's detention was governed by § 1231, and *Zadvydas*
presumptively reasonable six-month period was tolled by Second Circuit's
forbearance policy); *Severin v. Aviles*, No. 15-3711 (CCC), 2016 WL 1450550, at *3
n.3 (D.N.J. Apr. 12, 2016) (petitioner's *Zadvydas* period was tolled while the
petitioner's motion for a stay was pending in the Second Circuit); *Beckford*, 168 F.
Supp. 3d at 538 (removal period was "effectively stayed" by seeking review before
Second Circuit and forbearance policy); *Phrance v. Johnson*, No. 14-7693 (CCC),
2015 WL 8361780, at *2 (D.N.J. Dec. 8, 2015) (petitioner's *Zadvydas* period was
tolled while the petitioner's motion for a stay was pending in the Second Circuit),
*with Jean A.*, 2019 WL 6318305, at *2-3 (not tolling the removal or *Zadvydas* six-
month period for petitioner whose motion to stay was pending before Second
Circuit); *Medrano v. Taylor*, No. 17-5521 (ES), 2018 WL 2175774, at *3-4 (D.N.J.
May 11, 2018) (concluding that, if the forbearance policy is not the equivalent of a

---

(S.D.N.Y. July 2, 2019) (collecting S.D.N.Y. cases).  In this case, as in *Beckford*, the
PFR and motion for a stay were filed on different days.  *See* Dkt. 1-1, at 27-58
(Exhs. G, H); *Beckford*, 168 F. Supp. 3d at 535 (citing the forbearance policy as
being triggered by the filing of a PFR and a stay motion, but calculating the tolling
of the petitioner's removal period from the date of the PFR filing).  Thus, if the
Court were inclined to agree that the forbearance policy tolled the removal period,
Brathwaite's removal period would have run from December 11, 2019 through
February 2, 2020.

stay, the removal period runs, uninterrupted, from the date of petitioner's administratively final order of removal); *Mathews*, 2013 WL 5288166, at *3 (concluding that the petitioner's 90-day removal period was not tolled by petitioner's pending motions or the forbearance agreement, where petitioner had an administratively final order of removal); *Leslie*, 2010 WL 4226561, at *4 (concluding the forbearance policy does not toll the removal period); *D'Alessandro v. Mukasey*, 628 F. Supp. 2d 368, 386 (W.D.N.Y. 2009) (rejecting the government's argument "that an application for a stay 'act[s] as a temporary waiver of constitutional due process protections [so as to] . . . permit [the Government] to forego the statutory and regulatory procedures for justifying continued detention.'") (quoting petitioner's brief); *Shenxing Zeng v. Tripp*, No. CV 07-0682 JB/WPL, 2007 WL 9729144, at *4 (D.N.M. Oct. 3, 2007) (rejecting the government's argument that judicial review of a removal order tolls the removal period but declining to decide specifically whether the forbearance policy tolls the running of the removal period).[7]

---

[7] Some courts, in analyzing the statutory basis for detention in light of the forbearance agreement, use the language "toll the removal period" to mean delaying the start of the removal period under Section 1231. *See Argueta Anariba v. Shanahan*, 190 F. Supp. 3d 344, 349 (S.D.N.Y. 2016) ("District courts in this Circuit are divided as to whether the mere filing of a motion for a stay of removal, when combined with the forbearance policy, serves to toll the removal period and thus locate the movant within § 1226 rather than § 1231."). To avoid confusion, this Court has cited to cases where the court agreed that a petitioner in Brathwaite's position is detained under Section 1231, not Section 1226. Similarly, cases in which tolling was discussed, but in the context where the circuit court actually granted a stay and therefore "statutorily tolled" the removal period, are not helpful on this issue. *See, e.g.*, *Brodyak v. Davies*, No. 14-4351 (JLL), 2015 WL 1197535, at *3 (D.N.J. Mar. 16, 2015) (citing, for the proposition that "the six month reasonable period . . . is tolled when an alien requests judicial review of a removal order," several cases in which the court of appeals actually had ordered a stay of removal).

The statutory language does not justify a conclusion that the forbearance policy acts to toll Brathwaite's removal period. In fact, as the *Shenxing Zeng* court noted in its analysis of the statute, 8 U.S.C. § 1231(a)(1)(B) "provides that judicial review of a removal order does not delay the running of the removal period unless a court issues a stay of removal." 2007 WL 9729144, at *4 (citing *Martinez v. Gonzales*, 504 F. Supp. 2d 887, 893 (C.D. Cal. 2007)). Brathwaite has only met one of the conditions listed Section 1231(a)(1)(B)(ii): he has sought judicial review of his removal order, but the Second Circuit has not issued him a stay. 8 U.S.C. § 1231(a)(1)(B)(ii). Unless and until the Second Circuit grants the stay of removal, thereby triggering Section 1231(a)(1)(B)(ii), neither the judicial review of his removal order nor the forbearance policy affects the running of the removal period.

Neither does Section 1231(a)(1)(C), entitled "Suspension of period," incorporate a pause of the removal period because of the forbearance policy. Section 1231(a)(1)(C) provides the following:

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

8 U.S.C. § 1231(a)(1)(C). Decisions addressing this provision suggest a narrow interpretation, with courts upholding detention and tolling the removal period under Section 1231(a)(1)(C) for those noncitizens who have "demonstrated some sort of bad faith failure to cooperate"—such as providing false or inconsistent information or refusing to complete the requisite travel documents relating to the

22

execution of their removal. *See Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 501 (S.D.N.Y. 2009) (collecting cases where petitioner hampered agency efforts or refused to cooperate); *see also Diouf v. Mukasey*, 542 F.3d 1222, 1231-32 (9th Cir. 2008) (rejecting the argument that repeated petitions to the circuit court extends the removal period under 1231(a)(1)(C)).

A few courts have concluded that an alien "acts to prevent" his or her removal under 1231(a)(1)(C) by seeking judicial review of removal orders. *See, e.g., Bini v. Aljets*, 36 Fed. App'x 868, 869 (8th Cir. 2002) (petitioner's removal period was extended under Section 1231(a)(1)(C) by his obtaining a stay); *Flores v. Hassell*, No.: 4:18-cv-01493-CA-HNJ, 2019 WL 296729, at *2 (N.D. Ala. Jan. 23, 2019) ("The Eleventh Circuit . . . interprets the filing of a motion for stay of deportation as extending the removal period under 8 U.S.C. § 1231(a)(1)(C)."), *report and recommendation adopted by* 2019 WL 958403 (N.D. Ala. Feb. 27, 2019).

But most courts recognize that the removal period is not extended under this provision for noncitizens who are making use of—not exploiting—the judicial processes available to them. *See, e.g., Singh v. Whitaker*, 362 F. Supp. 3d 93, 101 n.6 (W.D.N.Y. 2019) ("Courts have interpreted this provision to mean that '*Zadvydas* does not save an alien who fails to provide requested documentation to effectuate his removal.'"); *D'Alessandro*, 628 F. Supp. 2d at 387 ("It seems fairly plain to this Court that the section contemplates acts of obstruction by the detainee that constitute willful refusal to cooperate with immigration authorities, not efforts to seek legally available judicial remedies."); *Shenxing Zeng*, 2007 WL 9729144, at

*4 ("[T]he language of 8 U.S.C. § 1231(a)(1)(C) suggests that it applies only to acts of bad faith or dishonesty, not to the exercise of legal rights.").

The Government has not argued that this section applies to extend Brathwaite's removal period. *See generally* Dkts. 9, 13. Nor is there anything in the record to suggest Brathwaite has acted in bad faith or failed to cooperate with the Government in securing documents. Brathwaite has made use of the available PFR process to obtain review of his removal order, which triggered the forbearance policy. Based on the case law and record here, neither Brathwaite's decision to seek judicial review in the circuit court nor the forbearance policy suspends the removal period in the way Section 1231(a)(1)(C) provides.[8]

Indeed, Section 1231(a)(1)(C) is the statutory toll provision, and it does not apply. A judicially-imposed toll here, where the statutory toll does not apply, is improper. Based on the arguments presented, the Court concludes that the forbearance policy does not toll the statutory 90-day period or the presumptively-reasonable removal period under *Zadvydas*. Thus, Brathwaite's statutory removal period expired 90 days after his order became administratively final—ending on

---

[8] This conclusion accords with the Second Circuit's comments in *Hechavarria*. 891 F.3d at 56 n.6. In a footnote, the Second Circuit observed that it did not have to address the issue of whether *Zadvydas* applied to a petitioner's lengthy detention while the petitioner sought review of his removal order. *Id.* But the Court noted that "the Supreme Court has spoken in a hypothetical, related context only of an immigrant who has substantially prolonged his stay by abusing the processes provided to him—not of an immigrant who merely made use of the statutorily permitted appeals process." *Id.* (internal citations and quotations omitted) (first quoting *Nken*, 556 U.S. at 436; then citing *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003)).

March 10, 2020.  And his period of presumptively reasonable detention under
*Zadvydas* ended on June 11, 2020.[9]

### B. Brathwaite Has Not Established He Is Entitled to Relief Under *Zadvydas*

#### 1. <u>Procedural Due Process</u>

Brathwaite argues that his prolonged detention without an adequate process
for review violates his right to procedural due process.  Dkt. 1, at 16 ¶¶ 62-63.   In
particular, Brathwaite argues that, if he is detained under 8 U.S.C. § 1231,[10] he
should receive a custody determination hearing because the 90-day removal period
has lapsed.  Dkt. 11, at 10.  And he argues that, because of the COVID-19 pandemic
and travel restrictions to Trinidad and Tobago, there is not a significant likelihood
that he can be removed to Trinidad and Tobago in the reasonably foreseeable
future.  Dkt. 11, at 11-12.

The Government maintains that Brathwaite's continued detention is lawful
under Section 1231(a)(6) and *Zadvydas* and, therefore, does not offend due process.
Dkt. 9, at 15, 17.  The Government argues that Brathwaite has not met his burden
of demonstrating there is no significant likelihood of his removal in the reasonably

---

[9] This Court, like most courts in this circuit, reads *Zadvydas* to mean that the six-
month presumptively reasonable period of detention starts after the entry of a final
order of removal, not after the expiration of the statutory 90-day removal period.
*See, e.g., Callendar v. Shanahan*, 281 F. Supp. 3d 428, 436 n.7 (S.D.N.Y. 2017)
(collecting cases).

[10] Brathwaite is no longer detained pending his removal proceedings.  Therefore,
"[t]o the extent that [Brathwaite] previously may have had a cognizable due process
argument [when he was detained] under [§ 1226], that claim has been rendered
moot." *Wang*, 320 F.3d at 147.  Thus, the Court makes no conclusions about
detention under Section 1226.

foreseeable future.  Dkt. 9, at 15-17.  And in its supplemental response, the Government indicates that it can still secure travel documents and arrange for Brathwaite's removal, despite the COVID-19 travel restrictions, once Brathwaite's Second Circuit case concludes.  Dkt. 13, at 2-3.  The Government also notes that Brathwaite has a pending 180-day Post Order Custody Review with ICE Headquarters, presumably in accordance with DHS regulations.  Dkt. 13-1, Marchewka Decl. at 2 ¶ 8.

After expiration of the 90-day removal period, if the removal period has not been extended, 8 U.S.C. § 1231(a)(6) gives the Government the discretion to continue detaining certain categories of aliens.  *See* 8 U.S.C. § 1231(a)(6) ("An alien ordered removed who is . . . removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title . . . may be detained beyond the removal period.").  In *Zadvydas,* the Supreme Court determined that Section 1231(a)(6) does not permit indefinite detention: rather, there is an "implicit limitation" on an alien's post-removal-period detention under Section 1231(a)(6) "to a period reasonably necessary to bring about that alien's removal from the United States."  533 U.S. at 689.

As discussed above, the first six months of an alien's post-removal detention under Section 1231 is "presumptively reasonable." *See id.* at 701.  Under *Zadvydas,* once the presumptively reasonable six-month period has passed, an alien may be released if he can establish that his removal is not reasonably foreseeable:

> After this [six]-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.  And for detention to remain

> reasonable, as the period of prior postremoval confinement grows, what counts as "reasonably foreseeable future" conversely would have to shrink. This [six]-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

*Id.*[11] The Second Circuit has explained that this "reasonable foreseeability" test "articulates the outer bounds of the Government's ability to detain aliens (other than those serving criminal sentences) without jeopardizing their due process rights." *Wang*, 320 F.3d at 146.

Brathwaite's six-month, presumptively reasonable period of detention expired less than two months ago. Because Brathwaite was ordered removed under 8 U.S.C. § 1227(a)(2), the Government had authority to detain him beyond the removal period, as provided in Section 1231(a)(6). *See* 8 U.S.C. § 1227(a)(2)(A). Although Brathwaite's detention has surpassed the presumptively reasonable period of six months, he is not entitled to be released on this basis alone. *See Zadvydas*, 533 U.S. at 701. Brathwaite is only entitled to relief under *Zadvydas* if he provides good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future, and the Government fails to respond with evidence sufficient to rebut that showing. *See Almonte v. Holder*, 983 F. Supp. 2d 234, 240 (W.D.N.Y. 2013) (citing *Zadvydas*, 533. U.S. at 701).

---

[11] In light of *Zadvydas*, DHS issued regulations providing for custody status review of noncitizens who have been detained for more than six months after a final order of removal is issued. *See, e.g.,* 8 C.F.R. § 241.13; Dkt. 9, at 7-8.

Brathwaite presents two possible obstacles to his removal in the reasonably foreseeable future: first, the Second Circuit's pending review of his final order of removal, which (with his stay motion) has triggered the forbearance policy; and, second, the COVID-19 pandemic, which has significantly restricted international travel, including to Trinidad and Tobago. *See* Dkt. 11, at 11-16. Brathwaite has failed to sustain his initial burden under *Zadvydas*.

The mere passage of time beyond the six-month presumptively reasonable period, while Brathwaite awaits the resolution of his PFR, does not satisfy his burden under *Zadvydas*. *See Almonte*, 983 F. Supp. 2d at 240 ("[S]everal cases decided within this district have found the habeas petitioner's assertion as to the unforeseeability of removal, supported only by the mere passage of time, insufficient to meet the petitioner's initial burden to demonstrate no significant likelihood of removal under the Supreme Court's holding in *Zadvydas*.") (collecting cases). Brathwaite is, of course, entitled to pursue judicial review of his final order of removal. But, as several courts have observed, "because the detention challenged by the habeas petition in this action has been prolonged by petitioner's own pursuit of judicial review of the final order of removal, the duration of his detention cannot be found to constitute a violation of his rights under the due process clause of the Fifth Amendment." *Beckford*, 168 F. Supp. 3d at 538-39; *see also Almonte*, 983 F. Supp. 2d at 241 ("[The] petitioner may not rely on the delay resulting from his request for circuit court review of the final order of removal to claim that his prolonged detention violates substantive due process.").

The exact timing as to the resolution of Brathwaite's PFR before the Second Circuit is unknown.  Nevertheless, the Court assumes that the Second Circuit will issue its decision without unnecessary delay.  Thus, the judicial review of his order of removal does not give Brathwaite a basis to argue that there is no significant likelihood of removal in the reasonably foreseeable future under *Zadvydas*.  *See, e.g.*, *Soberanes v. Comfort*, 388 F.3d 1305, 1311 (10th Cir. 2004) (concluding that petitioner's detention was not indefinite or potentially permanent by *Zadvydas* standards because it was "directly associated with a judicial review process that has a definite and evidently impending termination point"); *see also Urrutia v. Lynch*, No. 15-CV-513-JTC, 2015 WL 7288698, at *6 (W.D.N.Y. Nov. 16, 2015) (citing *Soberanes*, 388 F.3d at 1311) ("Detention during an appellate stay of removal, whether formal or in accordance with the Second Circuit forbearance policy, is not indefinite because the end of the litigation provides a definite end point.").

Further, the Court recognizes that the COVID-19 pandemic may complicate the circumstances of removal for petitioners like Brathwaite.  Brathwaite is correct, and the Government acknowledges, that the government of Trinidad and Tobago has restricted international air travel due to the COVID-19 outbreak.  Dkt. 11, at 12; Dkt. 13-1, Marchewka Decl. at 3 ¶ 10.  But Brathwaite has not shown that the Government will be unable to remove him within a reasonable time after the resolution of his petition for review—even with the travel restrictions and uncertainties caused by COVID-19.  Brathwaite has not provided any facts to

support his claim that he cannot be removed to Trinidad and Tobago once the recent travel restrictions due to the COVID-19 pandemic are lifted.

Indeed—and "critical to the analysis of reasonably foreseeable removal under *Zadvydas*"—the record suggests that the Government will be able to obtain travel documents and facilitate Brathwaite's removal shortly after the Second Circuit resolves his petition and motion for a stay of removal. *See Dover v. Holder*, No. 11-CV-508A, 2011 WL 4054952, at *4 (W.D.N.Y. Sept. 12, 2011).

First, the Government maintains, in both its initial answer and supplemental response, that there are no institutional barriers to Brathwaite's removal to Trinidad and Tobago. Dkt. 8, Smith Decl. at 7-8 ¶¶ 43-44.; Dkt. 13-1, Marchewka Decl. at 2-3 ¶ 9. ICE requested travel documents for Brathwaite from the Consulate of Trinidad and Tobago in December 2019, shortly after the BIA dismissed his appeal. Dkt. 8, Smith Decl. at 6 ¶ 37. The Government's records show that the Consulate communicated with ICE to request additional information about Brathwaite. Dkt. 8, Smith Decl. at 6-7 ¶ 38. Around the same time, Brathwaite filed his petition for review and motion for a stay of removal with the Second Circuit. Dkt. 8, Smith Decl. at 7 ¶¶ 39-40.

Second, statistical evidence reveals that DHS has succeeded in repatriating a number of aliens to Trinidad and Tobago in recent years. For example, DHS reports indicate it repatriated 125 aliens to Trinidad and Tobago in the fiscal year 2016; 143 aliens in the fiscal year 2017; and 118 aliens in the fiscal year 2018. *See* Dkt. 8, Smith Decl. at 7-8 ¶ 44; Dkt. 13-1, Marchewka Decl. at 2-3 ¶ 9 (citing DHS

Yearbook of Immigration Statistics, available at https://www.dhs.gov/immigration-statistics/yearbook.).  Indeed, as the Government argues, the only obstacle to Brathwaite's immediate removal is the forbearance policy in place while Brathwaite pursues judicial review of his removal order.

Moreover, subsequent briefing by the Government does not alter the expectation that, even with the travel restrictions related to the COVID-19 pandemic, Brathwaite's removal is significantly likely to occur in the reasonably foreseeable future—after the Second Circuit resolves his petition and motion for a stay of removal.  In its supplemental response, the Government reveals that ICE has taken additional concrete steps to remove Brathwaite. *See* Dkt. 13, at 3.  On June 19, 2020, DHS received travel documents for Brathwaite that were valid for travel to Trinidad and Tobago on or about June 25, 2020.  Dkt. 13-1, Marchewka Decl. at 2 ¶ 6.  And on June 25, 2020, DHS ran an ICE charter flight to Trinidad and Tobago; Brathwaite was scheduled to be on this flight.  Dkt. 13-1, Marchewka Decl. at 2 ¶ 7.  But, due to Brathwaite's pending case before the Second Circuit and the forbearance policy, DHS did not remove Brathwaite on this flight.  Dkt. 13-1, Marchewka Decl. at 2 ¶ 7.  Thus, even with the possible delays caused by the COVID-19 pandemic, the Government argues it can easily resume its efforts to remove Brathwaite, and that there are no reasons it would not be successful in doing so, once any travel restrictions are lifted.  Dkt. 13, at 3; Dkt. 13-1, Marchewka Decl. at 3 ¶ 10.  Brathwaite has presented no relevant facts to contradict this expectation. *See* Dkt. 14.

Several other courts facing similar arguments—that the COVID-19 pandemic and ensuing travel restrictions curtail the likelihood of a petitioner's removal in the reasonably foreseeable future—have denied *Zadvydas* relief when, as here, there are no significant impediments to prevent the petitioner's removal. *See Ramirez v. Searls*, No. 20-cv-6018 (CJS), 2020 WL 2748203, at *3 (W.D.N.Y. May 27, 2020); *Jaime F. v. Barr*, No. 19-20706 (ES), 2020 WL 2316437, at *5 (D.N.J. May 11, 2020); *Francis S.M. v. Decker*, No. 19-8053 (MCA), 2020 WL 1956053, at *4 (D.N.J. Apr. 23, 2020).

In *Jaime F.*, the respondents had obtained multiple sets of travel documents for the petitioner and had scheduled the petitioner's removal for the next available flight to Venezuela.  2020 WL 2316437, at *5.  Thus, the court determined there were "no impediments to prevent Petitioner's removal as soon as the national quarantine in Venezuela ends."  *Id.*  Similarly, in *Francis S.M.*, the court denied the petitioner's *Zadvydas* claim because, "[a]lthough travel to India is currently restricted, ICE asserts that it intends to schedule Petitioner on the earliest flight available to India."  2020 WL 1956053, at *4-5.  And in an analogous case in this district, the court concluded that the government had rebutted the petitioner's claim where it had obtained travel documents but was unable to remove the petitioner in March as planned due to COVID-19 related travel restrictions.  *See Ramirez*, 2020 WL 2748203, at *3.

Here, the Government received travel documents, and even scheduled Brathwaite on a chartered removal flight for late-June of this year.  Dkt. 13-1,

Marchewka Decl. at 2 ¶¶ 6-7.  These efforts occurred in the midst of the COVID-19 pandemic.  Indeed, the Government was still able to obtain travel documents from Trinidad and Tobago and *charter a flight there*, despite the borders being closed—and was only thwarted because of Brathwaite's pending PFR and motion for a stay with the Second Circuit.  Dkt. 13-1, Marchewka Decl. at 2-3 ¶¶ 6-7, 9-10.  Thus, even if this Court were to conclude that Brathwaite had presented sufficient evidence to show there is no significant likelihood of his removal in the reasonably foreseeable future, the Government has rebutted that evidence.  Where, as here, the Government indicates it has plans to remove Brathwaite after his Second Circuit case is resolved, provided it can do so consistent with COVID-19 travel restrictions, Brathwaite's claim fails.[12]  *See Ramirez*, 2020 WL 2748203, at *3.

In sum, Brathwaite has not met his burden to provide good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future—that is, he has not shown that the Government will be unable to remove him within a reasonable time after the resolution of his PFR.  Therefore, Brathwaite is not entitled to habeas relief under *Zadvydas*, and the petition is dismissed.[13]

---

[12] The Government has further indicated that Brathwaite has a 180-day Post Order Custody Review pending.  Dkt. 13-1, Marchewka Decl. at 2 ¶ 8.  Brathwaite has not alleged that this pending review, presumably pursuant to DHS regulations, is inadequate or deficient in any way—indeed, Brathwaite has declined to address the additional arguments and assertions made in the Government's supplemental reply. *See* Dkt. 14.

[13] The denial of this claim, at this time and on these facts, does not prevent Brathwaite from filing a petition in the future, in the event he is able to show his removal is no longer reasonably foreseeable under *Zadvydas*.

## 2. Substantive Due Process

Brathwaite's petition does not explicitly allege a violation of his substantive due process rights.  Rather, he argues his detention has become "unreasonably prolonged" and his "continued detention without a constitutionally adequate bond proceeding will erroneously deprive him of his 'strong interest in liberty.'"  Dkt. 1, at 16 ¶ 62.

To the extent that Brathwaite makes a substantive due process claim, that, too, must fail.  Pursuant to *Zadvydas*, Brathwaite's substantive due process rights "are not jeopardized by his continued detention as long as his removal remains reasonably foreseeable."  *Wang*, 320 F.3d at 146.  An alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.  *See Zadvydas*, 533 U.S. at 701.  At this time, the Court has not determined that there is no significant likelihood of Brathwaite's removal in the reasonably foreseeable future.  Thus, Brathwaite's substantive due process rights have not been violated.

## CONCLUSION

For the foregoing reasons, the relief requested in Brathwaite's petition for a writ of habeas corpus is denied.  His petition is dismissed—without prejudice to the filing of any new petition in the future based on new and different facts and consistent with the analysis above.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      July 31, 2020
            Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE